SUMMARY ORDER
The National Labor Relations Board’s (“Board”) General Counsel brings an application for enforcement of the Board’s Order, 345 N.L.R.B. 324 (2005), entered on August 25, 2005, finding that Respondents [“the Companies”], which are limited liability companies (“LLCs”) and management companies that own or manage eight apartment buildings in New York City and were deemed a joint employer by the Board, violated Section 8(a)(5) and (1) of the National Labor Relations Act (“the Act”), 29 U.S.C. § 158(a)(5) and (1), by refusing to bargain with the Stationary Engineers, Firemen, Maintenance and Building Service Union Local 670, RWDSU, UFCW, AFL-CIO (“the Union”) and by unilaterally subcontracting work to non-unit employees.[1] We assume the parties’ familiarity with the facts, proceedings below, and issues placed before the court.
We recognize the factual findings of the Board as “conclusive” if “supported by substantial evidence on the record considered as a whole.” 29 U.S.C. § 160(f). We “ordinarily defer to the expertise and discretion of the Board” in review of a representation proceeding. Bridgeport Fittings, Inc. v. NLRB, 877 F.2d 180, 183 (2d Cir.1989), and in unfair labor practice proceedings, NLRB v. Caval Tool Div., Chromalloy Gas Turbine Corp., 262 F.3d 184, 188 (2d Cir.2001).
The Regional Director determined in his decision and direction of election that the management companies and the LLCs were each a single employer and together a joint employer, and that the employees of the Companies’ eight apartment buildings were a single appropriate bargaining unit.[2] The Companies chal *913 lenge the findings of single-employer status. The single employer doctrine is applicable when “two nominally separate entities are actually part of a single integrated enterprise.” Clinton’s Ditch Coop. Co. v. NLRB, 778 F.2d 132, 137 (2d Cir.1985) (quoting NLRB v. Browning-Ferris Indus. of Pa., Inc., 691 F.2d 1117, 1122 (3d Cir.1982)). Single employer status requires consideration whether the two or more formally separate entities had “interrelation of operations, common management, centralized control of labor relations and common ownership.” Lihli Fashions Corp. v. NLRB, 80 F.3d 743, 747 (2d Cir.1996) (per curiam) (quoting Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) (per curiam)). The common usage of office facilities and family relationships between persons involved in the purportedly discrete companies is also relevant. Id.
The evidence before the Regional Director amply demonstrated that Uzi Einy, along with his family, owns, either wholly or in substantial part, each of the LLCs and management companies. Uzi Einy, in particular, had a substantial ownership stake in the Companies. In addition to common ownership, the record clearly indicated common management, interrelation of operations, and centralized control of labor relations through Uzi Einy’s central role in the Companies. For example, five employees testified at the pre-election hearing that Uzi Einy would instruct employees to work at particular buildings and would direct them to engage in particular work such that he was recognized as the de facto manager. There was testimony and documentary evidence that Uzi Einy signed paychecks for employees working at the various buildings. 700 West End Avenue, one of the buildings in the unit and the location of Uzi Einy’s office, was the address for several of the companies, was the address listed on three of the companies’ disability and workmen compensation policies, and was the address listed on the paychecks for all of the companies.
The existence of common ownership among family members, Uzi Einy’s substantial stake in the enterprises, and his centralized control of labor relations, along with the other factors, favor the findings of single employer status. See Lihli Fashions Corp., 80 F.3d at 747. The Regional Director, in the absence of contrary evidence from the time of decision, permissibly found admissions in Uzi’s prior testimony from another case conclusive on the question of his ownership interest in 675 West End Corp. The Regional Director, moreover, appropriately relied on the parties’ stipulation that “the ownership] and management companies are joint employers” at each of the eight buildings in concluding that the ownership and management companies were, together, a joint employer of those buildings, and that those employees were an appropriate bargaining unit. We therefore find that the Regional Director’s decision and direction of election was supported by substantial evidence.
The election occurred on January 29, 2000. The Companies challenged several ballots cast by doormen on the ground that they were “guard[s]” under the Act. 29 U.S.C. 159(b)(3). A bargaining unit for guards can only be comprised of guard-employees. See Truck Drivers Local Un *914 ion No. 807 v. NLRB, 755 F.2d 5, 8, 10 (2d Cir.1985). The Board has explained that
[g]uard responsibilities include those typically associated with traditional police and plant security functions, such as the enforcement of rules directed at other employees; the possession of authority to compel compliance with those rules; training in security procedures; weapons training and possession; participation in security rounds or patrols; the monitor and control of access to the employer’s premises; and wearing guard-type uniforms or displaying other indicia of guard status.
Boeing Co., 328 N.L.R.B. 128, 130 (1999). That some typical guard responsibilities form a “minor or incidental” part of an employee’s job duties does not transform a non-guard employee into a guard. Id.
The Regional Director found that the doormen were not guards, directed that the challenged ballots be counted, after which the Union won the election and was certified. The record supports this conclusion. The doormen control the access of visitors into the building by keeping doors locked and ensuring that visitors were authorized to enter the premises, receive and store packages for tenants, and clean the premises. The doormen do not wear uniforms and have no patrolling duties. While some of the doormen’s duties enhance security, this feature of the job does not convert them into guards as their security functions were “incidental” to the primary purpose of providing tenant services. 55 Liberty Owners Corp., 318 N.L.R.B. 308, 308, 310 (1995) (determining that similar duties were “incidental to [the doormen’s] primary function of providing courtesy oriented and receptionist type services to the tenants of the various buildings”). That doormen were supposed to contact police or fire officials in the event of an emergency, a duty not unique to guards, also does not indicate that the doormen were guards. See Purolator Courier Corp., 300 N.L.R.B. 812, 814 (1990). Moreover, there is no evidence that the doormen were required to enforce rules against other employees, the central purpose for which the “guard” exception was enacted. See Truck Drivers Local Union No. 807, 755 F.2d at 8-9 (explaining that the exclusion of guards from non-guard unions was intended to prevent guards from experiencing “conflicting loyalties” between their employer and non-guard employees in the event of a labor dispute).
The Companies next argue that the Acting Regional Director erred in rejecting their post-election objections untimely. The Companies’ objections to the rulings made during the initial representation proceeding and to the finding that the doormen were not “guard[s]” under the Act were previously raised before the Board and were rejected. The Companies’ remaining objections related to the conduct of the election itself and were properly considered untimely under 29 C.F.R. § 102.69(a), which requires that “objections to the conduct of the election or to conduct affecting the results of the election” be filed “[w]ithin 7 days after the tally of ballots has been prepared,” regardless of any pending ballot challenges.
In the unfair labor practice proceeding, the administrative law judge (“ALJ”) found that the Companies violated the Act by (1) refusing to bargain or to provide the Union with information after the Union’s certification and (2) hiring non-unit employees, i.e. Command Security, to perform unit employees work without notice to the Union or an opportunity to bargain. The Board adopted those findings. An employer violates the Act if it makes unilateral changes in wages, hours, and terms and conditions of employment, without no *915 tifying the union or giving it a meaningful opportunity to bargain. NLRB v. Katz, 369 U.S. 736, 737 & n. 2, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). The Supreme Court has found that an employer’s decision to subcontract positions of the bargaining unit is a “subject of mandatory bargaining.” Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 213, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). The Companies do not contest these principles of law, but rather, argue that they had no duty to bargain at the time Command Security was hired because the Union was not yet certified. The Companies do not challenge the first ground for the Board’s decision that the Companies refused to bargain after the Union’s certification. We find that substantial evidence supports the Board’s conclusion that Companies committed post-certification violations of the Act.
We also find that the Board’s conclusion that the Command Security contract violated the Act was supported by substantial evidence. The Companies acted at their own peril when challenges to the ballots were pending and the Union was ultimately certified. Mike O’Connor Chevrolet, 209 N.L.R.B. 701, 703 (1974), enforcement denied on other grounds by 512 F.2d 684 (8th Cir.1975). It is a longstanding rule “that, absent compelling economic considerations for doing so, an employer acts at its peril in making changes in terms and conditions of employment during the period that objections to an election are pending and the final determination has not yet been made.” Id. When the Board “rejects the employer’s objections and certifies the union, the employer’s duty to bargain relates back to the date of the election.” Mission Foods, 2007 WL 2209336, 350 N.L.R.B. No. 36, at 11 (July 27, 2007). Here, the date of the election was January 29, 2000. The Board reasonably found that the Command Security contract did not take effect until February 2001 and that a Command Security employee first replaced a unit employee in March 2001. The Companies have not shown compelling economic circumstances for subcontracting with Command Security. The Companies’ unilateral decision to subcontract with Command Security, which occurred after the date of election, is therefore a violation of sections 8(a)(5) and (1) of the Act. The Companies raise a number of additional procedural and evidentiary challenges to the unfair labor practice proceeding that are without merit.
The Companies argue that the enforcement of the Board’s Order should wait until the Board determines whether changed circumstances warrant relief from compliance. We disagree. It is common practice for the Board to seek enforcement of an order directing remedial action while leaving the resolution of particular “details” of a remedy for a later compliance proceeding. NLRB v. G & T Terminal Packaging Co., 246 F.3d 103, 124 (2d Cir. 2001); see also NLRB v. Katz’s Delicatessen of Houston Street, Inc., 80 F.3d 755, 771 (2d Cir.1996) (“Compliance determinations are routinely made ‘after entry of a Board order directing remedial action, or the entry of a court judgment enforcing such [an] order.’ ” (alteration in original) (quoting 29 C.F.R. § 102.52)). This is not a case where the evidence on record at the time of the unfair labor practice proceeding established that compliance would place an “undue burden” on the employer. See G & T Terminal Packaging Co., 246 F.3d at 125. There is no basis to delay enforcement.
The Companies allege changed circumstances. Even if, as the Companies assert, the number of unit employees in the Companies’ workforce at the buildings has fallen to only seven of twenty-three employees, the mere loss of majority status does *916 not release an employer from the bargaining obligation. Brooks v. NLRB, 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed. 125 (1954) (“If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit.”) Furthermore, the Board order requires the Companies to bargain with the Union “as if the initial year certification ha[s] not expired.” See Bryant & Stratton Bus. Inst., Inc. v. NLRB, 140 F.3d 169, 185 (2d Cir.1998) (recognizing the Board’s authority to extend the certification year and require the employer to bargain when the employer has failed to bargain during the initial certification year). The Union is entitled to a “conclusive presumption of majority status” for the first year following certification. NLRB v. Simon DeBartelo Group A/W M.S., 241 F.3d 207, 210 (2d Cir.2001) (quoting Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 37, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987)). In any event, the Board may address evidence of changed circumstances during compliance proceedings.
The Board’s Order directs the Companies, inter alia, to “[rjestore the status quo ante by assigning a unit employee to perform the work currently performed by a nonunit employee of Command Security Corporation.” This Court has jurisdiction “to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board.” 29 U.S.C. 160(f); see also KBI Sec. Serv. v. NLRB, 91 F.3d 291, 295 (2d Cir.1996). The Board’s Order is outdated insofar as the Companies no longer have a contract with Command Security and have since subcontracted with another company. We modify the Board’s Order to read that the Companies must “Restore the status quo ante by assigning a unit employee to perform the work currently performed by a nonunit employee.” The modification reflects that the Companies have a duty to bargain with the Union and that, whichever subcontractor the Companies seek to hire, the decision to hire nonunit employees from a subcontractor is a mandatory subject of bargaining. Fibreboard Paper Prods. Corp., 379 U.S. at 213, 85 S.Ct. 398.
For the foregoing reasons, we GRANT the petition for enforcement consistent with this Order.

. The administrative law judge also found that the Companies violated Section 8(a)(3) and (1) of the Act by hiring non-unit employees to replace bargaining unit employees in retaliation for their participation in protected activities. The Board did not adopt that finding since the remedy would not be materially different based on the Section 8(a)(5) and (1) refusal to bargain violations.

. The Companies' assertion that the Union did not allege single employer status is incorrect. The Union's petition for election stated that the proposed bargaining unit included *913 "[a]ll full-time and regular part-time doormen, porters, maintenance employees and superintendents," specifically wrote all of the Companies as the "employer,” and listed all of the buildings. The Union also argued single employer status before the Regional Director.