789 F.2d 524
 122 L.R.R.M. (BNA) 2224, 54 USLW 2627,
104 Lab.Cas. P 11,859
 NATIONAL LABOR RELATIONS BOARD, Petitioner and Cross-Respondent,
and
Warehouse, Mailorder, Office, Technical and Professional
Employees Local 743, International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and
Helpers of America,
Intervening Petitioner,
v.
AFFILIATED MIDWEST HOSPITAL, INC., d/b/a Riveredge Hospital,
Respondent and Cross-Petitioner.
 Nos. 85-1752, 85-1848.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 12, 1985.
Decided April 23, 1986.
 
 Fred Howard, Elliott Moore, Washington, D.C., for petitioner.
 Joel A. D'Alba, Asher, Pavalon, Gittler & Greenfield, Ltd., Chicago, Ill., Ronald C. Henson, Ford & Harrison, Atlanta, Ga., for respondent.
 Before COFFEY, FLAUM, and RIPPLE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 This appeal arises from challenges to a union decertification election that occurred over six years ago. The employer, which was unsuccessful in ridding itself of collective bargaining obligations, complained of a number of election irregularities, including union misrepresentation of the National Labor Relations Board's processes, failure to allow an employee properly within the unit but not on the voting list to cast a ballot, improper description of the bargaining units in the notice of election and the Board's certification orders, and confusion resulting from erroneous election notices. The Board, in a much delayed decision, affirmed the validity of the election results and subsequently, upon the employer's refusal to bargain, found that an unfair labor practice had been committed. In reaching its result the Board took a significant departure from its past precedent by declaring that misrepresentation of the NLRB's actions would no longer automatically require the invalidating of an election. Thus, on appeal, the employer contests not only the correctness of the Board's rulings on the conduct of the election but also the validity and retroactive application of the Board's new misrepresentation rule. Finding adequate support in the administrative record for all of the NLRB's conclusions, we affirm.
 
 
 2
 * The employees in the technical and the service and maintenance units[1] at the Riveredge Hospital in Park Forest, Illinois had been represented by the Union since June 14, 1978. Approximately one year later two employees filed petitions seeking to decertify the Union in both units. These petitions contained certain inaccuracies in that two positions, EKG/EST technician and medical technician, properly included in the technical unit were placed in the service and maintenance unit and a number of positions were omitted from the technical unit description. The employer, Affiliated Midwest Hospital, Inc. ("Affiliated Midwest"), owner of Riveredge, filed its own petition in July, 1979, which contained the correct unit descriptions as stated in both the collective bargaining agreement and the initial Board certification in 1978.
 
 
 3
 On August 10, 1979, Stipulations for Certification upon Consent Election, which were designed to control the conducting of the decertification election, were signed. The Stipulations did not contain unit descriptions but did incorporate by reference a list of eligible voters and their job classifications, a so-called Norris-Thermador list. See Norris-Thermador Corp., 119 NLRB 1301 (1958). The Norris-Thermador list accurately reflected the unit classifications of the collective bargaining agreement rather than the erroneous petition initially filed by the two employees. The list did contain, however, a significant error. The names of two employees, Ronnie Green and Alberto Anton, were inadvertently omitted from the service and maintenance unit list.
 
 
 4
 The problem of conflicting unit descriptions surfaced in the Board's issuance of notices of election. Two weeks prior to the election it was discovered that the notices that the NLRB required the employer to post contained the same erroneous unit description that appeared in the employees' petition. The hospital notified the Board of the error but no changes were made and the notices were posted. Affiliated Midwest contends that these notices resulted in employee confusion, a confusion which, according to the hospital, directly caused an "unusually low" voter turnout. Only seventy-three percent of eligible employees voted in contrast to the over eighty-five percent participation in the initial certification election in 1978.
 
 
 5
 During the course of the actual voting the omission of employees Green and Anton from the Norris-Thermador list was discovered when both employees attempted to vote. The NLRB agents initially refused to allow the two to cast challenged ballots. Once the clerical nature of the omission was revealed, Mr. Anton was allowed to cast a challenged ballot in the service and maintenance unit. Ms. Green, however, had already left the premises and was, thus, unable to participate in the election. The voting resulted in a majority in favor of continued representation in both the service and maintenance unit and the technical unit. The vote was relatively close: the technical unit totals were forty-six to thirty-eight, while the service and maintenance totals were twenty-five to twenty-three. The challenged ballot of Mr. Anton was not included since, in the absnece of a vote from Ms. Green, it was irrelevant to the ultimate result.
 
 
 6
 Affiliated Midwest filed timely objections to the election results. The objections were based on the problems surrounding the unit descriptions and the voting lists and, more significantly, a series of alleged misrepresentations made by the Union during the period between the filing of the petitions and the election. The most controversial of these statements was a leaflet entitled "U.S. GOVERNMENT ISSUED A COMPLAINT AGAINST RIVEREDGE." In fact, no action had been taken by the NLRB against the employer. The charge that had been filed resulted in a settlement containing a non-admissions provision.
 
 
 7
 On November 21, 1979, the Regional Director recommended that the election be set aside on the grounds that the discrepancies between the election notices and the Norris-Thermador list evidenced a failure of the parties to agree on the bargaining unit, making certification impossible. This recommendation was rejected by the Board and the case remanded. Riveredge Hospital, 251 NLRB 196 (1980). The Board concluded that there was agreement on the appropriate units and that any discrepancies were immaterial. The only appropriate unit in the decertification election is the recognized bargaining unit and the proper units were deemed to be represented by the stipulated Norris-Thermador lists.
 
 
 8
 On remand the Regional Director once again issued a recommendation that a new election be held. With respect to the denial of Ms. Green's ability to vote and the faulty election notices, the Regional Director found there was no material error. The misrepresentation of NLRB action, however, was held to require the disregarding of the election results under Formco, Inc., 233 NLRB 61 (1977), because the Union's actions "injected the Board into the campaign and caused its neutrality to be impaired."
 
 
 9
 For reasons that are not apparent from the record, the Board delayed two years before eventually overruling the Regional Director and certifying the election results. In the intervening two years the Board reversed itself for the third time in five years with regard to the effect of misrepresentations generally on labor elections. In Midland National Life Insurance, 263 NLRB 127 (1982), the Board held that misrepresentations would not constitute per se grounds for vacating an election. The decision did not expressly deal with misrepresentations concerning the NLRB's processes or actions; this is an area of voting problems where the Board, despite its machinations over general misrepresentations, has consistently refused to certify union elections. See Formco, 233 NLRB 61 (1977). In reversing the Regional Director in the present case, the Board expressly overruled Formco, finding that there "was no sound reason why misrepresentations of Board actions should be on their face objectionable or be treated differently than other misrepresentations." Riveredge Hospital, 264 NLRB 1094, 1095 (1982).
 
 
 10
 In response to the certification order Affiliated Midwest refused to bargain with the Union on the theory that the certification order was improper. Unfair labor practice charges were filed against Affiliated Midwest, which responded by contesting the merits of the Board's decision and the retroactive application of the overruling of Formco. The Board ruled that the employer was attempting to relitigate issues already dealt with in the certification proceedings without offering any new evidence or special circumstances that would require re-examination. On this basis summary judgment was granted.
 
 
 11
 In September of 1983, Affiliated Midwest filed a motion for reconsideration on the grounds that the Board did not have the complete record before it when it ruled on the certification question in 1982. The Board once again waited close to two years before ruling. On March 13, 1985, the NLRB denied the motion for the alternative reasons that the employer was aware at an earlier stage of the proceedings of what the Regional Director had transmitted to the Board and thus waived the argument and that Affiliated Midwest raised only legal challenges to the Regional Director's decision so that factual matters implicating the record were not at issue.
 
 II
 
 12
 Affiliated Midwest comes before this court with essentially the same arguments it presented to the Board during the certification proceedings. First, and most significantly, it challenges the validity and retroactivity of the Board's new misrepresentation standard. Second, it questions the propriety of the refusal to allow an employee not on the Norris-Thermador list but properly within the unit to cast a ballot. Third, Affiliated Midwest claims that the erroneous unit description in the notices of election resulted in the Board certifying improper units. Finally, the erroneous election notices that were required to be posted in the hospital are alleged to have caused voter confusion sufficient to destroy the "laboratory conditions" mandated for certification elections.
 
 
 13
 Before reaching the merits there is the threshold issue of the proper standard of review. "It is well settled that direct judicial review of a Board decision to certify a collective bargaining representative on the basis of an election is extremely limited." NLRB v. Tom Wood Datsun, Inc., 767 F.2d 350, 352, 353 (7th Cir.1985). The degree of the deference required is well described in the en banc decision in Mosey Manufacturing Co. v. NLRB, 701 F.2d 610, 613-15 (7th Cir.1983). The majority in Mosey stated that while "[w]e may assume that the soundness of an election rule is not the business of the reviewing court," the "substantial evidence on the record as a whole" standard applied to factual determinations should also apply to the application of the Board's election rules to the facts of a given case. 701 F.2d at 615.[2]
 
 
 14
 Thus, Affiliated Midwest faces a heavy burden in establishing grounds for not enforcing the Board's bargaining order. In order to challenge the Board's policies directly, as opposed to its applications of those policies, the movant must establish that the NLRB's interpretation of the law is unreasonable. See NLRB v. Action Automotive, Inc., 469 U.S. 490, 105 S.Ct. 984, 988, 83 L.Ed.2d 986 (1985). See also Tom Wood Datsun, 767 F.2d at 353 ("At a minimum, we will not question a Board election rule which in our view is reasonable."). With respect to the alleged errors in the conduct of the election, Affiliated Midwest must establish that there is not substantial evidence supporting the conclusion that any election irregularities or misconduct did not "so impair the integrity of the ballot result that invalidation of the election is necessary." NLRB v. Southern Health Corp., 514 F.2d 1121, 1123 (5th Cir.1975).
 
 A. The Demise of Formco
 
 15
 This case is nothing more than the latest chapter in what has become a continuing saga concerning the NLRB's posture with regard to election misrepresentations. Prior to 1977 the Board adhered to the standard of Hollywood Ceramics, 140 NLRB 221 (1962), which established that certain types of representations required the invalidation of a certification election. This policy was abandoned in Shopping Kart Food Market, Inc., 228 NLRB 1311 (1977), only to be reinstated twenty months later in General Knit of California, 239 NLRB 619 (1978). Hollywood Ceramics-General Knit's standard survived for four years before its most recent abandonment in Midland National Life Insurance Co., 263 NLRB 127 (1982). See generally Mosey, 701 F.2d at 611-12 (detailing the history of the rule). Throughout this turbulent period of agency policy-making the Board consistently adhered to the policy that alterations of NLRB documents, or misrepresentations of Board processes and actions, required that an election be vacated. See Dubie-Clark, 209 NLRB 217 (1974); Formco, 233 NLRB 61 (1977); Kinney Shoe Corp., 251 NLRB 498 (1980). The separate treatment provided for misrepresentations of Board actions was based in part on the additional consideration present in such cases of the NLRB's neutral role in labor disputes. See Natter Manufacturing Corp. v. NLRB, 580 F.2d 948, 951 (1978).
 
 
 16
 In its challenge to the reasonableness of the NLRB's reversal of the Formco policy, Affiliated Midwest stresses the Board's "on-again off-again" treatment of misrepresentations generally as compared to the consistent approach to Formco-type misstatements. The history of this aspect of labor policy illustrates a number of things, but it does not establish that the Board's choices are unreasonable. The fact that a policy has existed for a long period of time does not alone establish that all alternatives are incorrect or untenable.
 
 
 17
 Any argument against the Board's decision in the present case implicitly contests two underlying conclusions. First, since the decision here is based on Midland's assertion that misrepresentations do not, in and of themselves, require the setting aside of elections, Affiliated Midwest is challenging the reasonableness of the Midland decision. In the three years between the Board's decision and this appeal, the validity of Midland has become well established in the courts of appeals.[3] See NLRB v. Best Products, Inc., 765 F.2d 903, 911-13 (9th Cir.1985) (detailing the acceptance of the Midland rule). See also NLRB v. Chicago Marine Containers, Inc., 745 F.2d 493, 498-500 (7th Cir.1984).
 
 
 18
 Second, assuming that misrepresentations are not per se objectionable, Affiliated Midwest also challenges the abandonment of the reason for distinguishing misrepresentations of Board actions, namely that these false statements impugn the neutrality of the NLRB. The Board justified its decision on three grounds. First, the adherence to a neutral posture was considered undercut by the fact that truthful representations of agency action are permitted. From the standpoint of appearances, any statements concerning NLRB action against a party, whether true or not, run the risk of skewing the Baord's stance in the minds of the voters. Second, misrepresentation was viewed as different from the alteration of a Board document, an action that Midland considered to be per se objectionable, 263 NLRB at 133 n. 25, on the grounds that when the speaker is a party rather than the agency itself the voters are less likely to consider the statement truthful. Finally, and most importantly, the Board held that this type of misrepresentation, like all misrepresentations, was subject to correction by the opposing party. The damage here is not so unique that only the Board can remedy it. Given the judicial acceptance of Midland, the Board's extension of that policy to the type of conduct involved here cannot be deemed to be unreasonable as a matter of law.[4]
 
 
 19
 More significant, from Affiliated Midwest's perspective, than the validity of the decision to forego Formco is the retroactive application of the new ruling. Affiliated Midwest contends that the extraordinary delay associated with this case brings this appeal into the scope of our holding in Mosey where retroactive application of Midland was denied. In Mosey five years had passed between a closely decided election and the appeal. During this period the Board policy with respect to misrepresentations was in a state of flux. Midland was decided subsequent to the oral argument in Mosey but prior to the original panel's decision. A majority of this court sitting en banc held that the facts of the case were "so unusual ... that we cannot be sure it was in the Board's contemplation when the Board announced" that Midland would apply to all pending cases. 701 F.2d at 612. "We noted that remand to the Board would therefore be appropriate to allow the Board to decide which standard to apply, but declined to do so because the lengthy, Board-caused delay convinced us that its order should not be enforced at all." Chicago Marine Container, Inc., 745 F.2d at 499 (describing the holding of Mosey ). Affiliated Midwest points to the long delay, seven years, and the closeness of the election, as evidence of the analogy to Mosey.
 
 
 20
 "Generally, a decision which changes existing law or policy is given retroactive effect unless retroactive application would cause 'manifest injustice.' " NLRB v. Lyon & Ryan Ford, Inc., 647 F.2d 745, 757 (7th Cir.) (citing Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)), cert. denied, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981). This court, in reliance on Chevron, 404 U.S. at 106-07, 92 S.Ct. at 355, has looked at three factors in deciding under what circumstances a nonconstitutional decision will be given prospective effect only: "the reliance of the parties on pre-existing law; the effect of retroactivity on accomplishing the purpose of the law; and any injustice arising from retroactive application." Chicago Marine, 745 F.2d at 499. See also Lyon & Ryan Ford, 647 F.2d at 757. This case does not present the "manifest injustice" that existed in Mosey. Cf. Chicago Marine, 745 F.2d at 499. Affiliated Midwest, unlike the employer in Mosey, is not facing a changed rule on appeal following an agency decision based on the former policy. The basic change in policy (Midland ) was made prior to the NLRB's decision in this case and the expansion occurred in the present case. The employer here did not go through the extensive appellate litigation involved in Mosey only to have the rules changed at the last minute. Retroactive application is not as troublesome when the policy is applied to the case declaring it, as opposed to a case pending on appeal. Cf. Best Products, 765 F.2d at 913 ("Given that there had only been a report and recommendations to hold a hearing and no Board decision in this case before Midland was handed down, it is problematical whether retroactivity is even needed here."). To refuse to allow the Board to apply policy changes in the case in which the new approach is declared would severely curtail the Board's practice of declaring policy through adjudication. The prospective application of a rule announced in adjudicatory proceedings is an improper exercise of the Board's quasi-legislative power to promulgate rules. See NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).
 
 
 21
 Furthermore, to the extent retroactivity is at issue, it is hard to see how Affiliated Midwest could be considered to have detrimentally relied on pre-existing law. As pointed out in Chicago Marine, the area of election misrepresentations has been in such a flux that it is difficult to describe any policy as pre-existing law. Chicago Marine, 745 F.2d at 499. While it is true that the NLRB had been constant about its adherence to Formco, the decision in Midland was handed down prior to the ruling in the present case. This change in policy put the employer on notice that a new standard with regard to misrepresentations of Board actions was a possibility.[5] Thus from a litigation standpoint, there is not a strong reliance claim where the initial adjudicatory body applies a new standard in the context of an emerging change in policy or law. This is in contrast to the situation in Mosey and Chicago Marine, a case in which Midland was retroactively applied, where the policy change occurred after the initial Board decision.
 
 
 22
 Reliance can relate to matters outside of the actual litigation. In particular, parties can organize their affairs in a certain manner only to have the rules changed when called into court. See, e.g., Continental Web Press, Inc. v. NLRB, 742 F.2d 1087, 1092-93 (7th Cir.1984) (change of long standing policy with regard to scope of units in lithographic printing plants). The actual harm in the present case stems from the hospital not counteracting the Union propaganda and thus being "more honest than it was legally required to be" during the course of the campaign. Chicago Marine, 745 F.2d at 500. "This is not the sort of hardship contemplated in Chevron...." Id. Under the circumstances of this case Affiliated Midwest was not faced with a new policy that affected the essence of its purpose and operation. The type of "injustice" that can preclude retroactive effect is not present in this case.
 
 
 23
 What remains of Affiliated Midwest's claim is the inequity of being subject to inexcusable Board delay and the incumbent issue of having an employer bargain with, and employees represented by, a union that won an election seven years ago. While this court in Mosey did use its equitable power to deny enforcement of an order, delay alone did not mandate that result. In Mosey the issue was whether the matter should be remanded where unusual circumstances made the Board's intent to have Midland apply to the case unclear. 701 F.2d at 612. Unlike Mosey, there is no question of Board intent. This action is at an end and there is no issue requiring remand to the Board for further proceedings. There is no reason to deny enforcement on the grounds of delay in the absence of a tangible harm to the parties. Affiliated Midwest contends that it and its employees are harmed by having the union "foisted" upon them after seven years. As sympathic as this argument is, the court in Chicago Marine explicitly rejected it.
 
 
 24
 If the delay and cost incident to ordinary review of a representation election were enough to trigger the "unusual circumstances" exception of Mosey, any employer fortunate to have had a representation election at the proper time could compel the use of the [Board's former] standard by objecting to an alleged misrepresentation and going through the review process. Mosey clearly was not intended to produce any such result.
 
 
 25
 745 F.2d at 499 n. 7. See also NLRB v. Schill Steel Products, Inc., 480 F.2d 586, 591 (5th Cir.1973) (A claim of injustice stemming from an "old" election ignores the fact "that there once was indeed a fair representation election ... and that the union was selected by a majority of the employees."). Thus, while we in no way sanction the Board's handling of this matter and if further proceedings were necessary we would not hesitate to deny enforcement of the decision, enforcement will not be denied on the basis of the inappropriateness of retroactive application of the Board's new misrepresentation policy.
 
 B. Refusal to Allow an Employee to Vote
 
 26
 The second alleged error in the Board's certification ruling (as distinguished from the later unfair labor practice proceeding) relates to the NLRB agent's refusal to allow Ronnie Green, whose name did not appear on the Norris-Thermador list, to cast a challenged ballot. "It is well settled that generally pre-election agreements are binding upon the Board." NLRB v. Speedway Petroleum, 768 F.2d 151, 154 (7th Cir.1985). Requiring these agreements to adhere to a standard of absolute perfection would undermine the goal of having the parties expedite the handling of representation elections without extensive Board involvement. See Stanley Aviation Corp., 112 NLRB 461, 462-63 (1955).
 
 
 27
 In this case there was no allegation of manipulation: the failure to include Ms. Green's name was an inadvertent clerical error. Cf. Illinois Valley Community Hospital, 249 NLRB 410 (1980). Nor is this a case in which the magnitude of the error was aggravated by discovery before balloting began so that correction was possible. See Smith & Smith Aircraft Co. v. NLRB, 735 F.2d 1215, 1219 (10th Cir.1984); Southhampton Marine Corp., 221 NLRB 649 (1975). "[T]he inadvertent omission of an eligible employee ... does not render a vote list susceptible to challenge by either party unless the mistake is discovered in sufficient time to permit its correction before balloting begins." NLRB v. Flowers Baking Co. of Gadsden, 578 F.2d 1145, 1147-48 (5th Cir.1978). See also Pyper Construction Co., 177 NLRB 707 (1969). Smith & Smith, 735 F.2d at 1219 (discussing the standard). This case is indistinguishable from Flowers Baking and the doctrine of that case is controlling.
 
 
 28
 Affiliated Hospital's contention that the list is invalid since the omissions meant the election was not held in the appropriate bargaining unit is untenable if Norris-Thermador lists are to be of any value. Under this theory the list would be a valid guide only if it were letter-perfect which would defeat the saluatory effect of having the parties stipulate to eligibility. There would have to be constant and careful agency review to prevent clerical errors from upsetting elections. Furthermore, both the Union and the employer were in a position to catch any error prior to the actual voting. While it would have been preferable for the NLRB agent to allow Ms. Green to cast a challenged ballot, as was done in the case of Mr. Anton, in the absence of willful misconduct by the parties or the Board this unfortunate clerical error by the parties does not require the invalidation of the election.
 
 
 29
 C. Inaccuracies in the Certified Bargaining Unit and the Election Notices
 
 
 30
 Affiliated Hospital's final two contentions relate to the use of the inaccurate unit descriptions contained in the initial employees' petition as the basis for the election notices. It is alleged that these errors resulted in voter confusion and ultimately the certification of improper bargaining units. The Board in its 1980 decision found any errors to have inconsequential effects on the election and that the parties had agreed to and conducted a valid election in the appropriate units. Unfortunately, the Board in issuing its 1982 decision, and its August, 1983 bargaining order, continues to describe the bargaining unit based on the erroneous unit description. Thus, the Board appears to have caught itself in a web of administrative sloppiness, declaring that the employer bargain with the units set out in the collective bargaining agreement and then ordering bargaining in the wrong unit.
 
 
 31
 With respect to the effect of the improper notices on the election, Affiliated Midwest has presented no reason to disturb the Board's finding. The discrepancies between the notices and the Norris-Thermador list consisted of (1) the inclusion of the positions of EKG/EST and medical technician in the service and maintenance unit rather than the appropriate technical unit and (2) the failure to omit certain non-occupied positions not on the stipulated list from the notices. The Board found these errors to be immaterial. The erroneous placement or inclusion of vacant positions could not have an impact on the election, and the improper inclusion of the medical technician in the service unit was inconsequential because that employee voted in the technical unit in accord with the Norris-Thermador list. Under these circumstances there is substantial evidence supporting the Board's conclusion that the election was in fact held in the appropriate units. Affiliated Midwest's claim of voter confusion is nothing more than a speculative assertion. The employer focuses on the low voter turnout. There are, however, myriad reasons for why a person may fail to vote, and there is no evidence identifying a dominant factor in this case. In fact, the employee most likely to be confused, the medical technician, participated in the election and voted in the correct unit.[6]
 
 
 32
 More troubling is the Board's continued use of the improper unit descriptions. As was stated in the initial NLRB decision, "[i]t is well established that the only appropriate unit in a decertification election is the existing or recognized bargaining unit." Riveredge Hospital, 251 NLRB 196, 197 (1980) (citing Booth Broadcasting Co., 134 NLRB 817 (1961)). See also Fast Food Merchandisers, 242 NLRB 8 (1979). On the basis of the Norris-Thermador list the Board justifiably concluded that the parties had agreed to and in fact conducted a decertification election in the recognized units. This would seem to indicate that the Board intends the employer to bargain with the units set out in the collective bargaining agreement and not those described in the employees' petition or the Board's subsequent orders.
 
 
 33
 While we are not unmindful of the fact that the Board was aware of the errors in the notices two weeks prior to the election and the fact that the Board continues to rely on the notices despite acknowledgment of the error, we cannot overturn an election based on technical errors that reflect only on the NLRB's competence rather than the validity of the election. Affiliated Midwest's claim that the election was held in an inappropriate unit requires an elevation of technical perfection over reality that cannot be accepted. See NLRB v. Southern Health Corp., 514 F.2d 1121, 1123 (7th Cir.1975) ("the election environment itself produces many instances of campaign impropriety which employees frequently ignore or discount."). Thus, the discrepancy between the Board's bargaining order and the units described in the collective bargaining agreement and the Norris-Thermador list will not serve as the basis for denying enforcement. The bargaining order and all documents required to be posted under it, however, must be modified to reflect the appropriate bargaining unit. See generally NLRB v. Custom Excavating, 575 F.2d 102 (7th Cir.1978); NLRB v. Copps Corp., 458 F.2d 1127 (7th Cir.1972).
 
 III
 
 34
 Affiliated Midwest's final objection relates not to the substance of the certification proceedings but to the procedure. In ruling on the certification issue for the second time in 1982, the Board did not have before it the full record compiled by the Regional Director pursuant to the Board's 1980 remand. This is alleged to make the order unenforceable under Prairie Tank Southern, Inc. v. NLRB, 710 F.2d 1262 (7th Cir.1983). Although the hospital was aware of the situation at the time of the unfair labor practice proceeding, it did not raise the issue until its motion for reconsideration of the bargaining order issued in the enforcement proceeding. Under these circumstances Affiliated Midwest is deemed to have waived this argument.
 
 
 35
 In Prairie Tank this court created an exception to the rule that all available arguments be presented at the representation rather than the enforcement stage. The employer in that case did not object to the inadequacy of the record at the certification proceedings but did raise the point during enforcement. This Court found that the issue was preserved because Prairie Tank did object at the earliest opportunity after discovering the facts forming the basis for the argument and because in the period between the two proceedings the decision in NLRB v. Allis-Chalmers Corp., 680 F.2d 1166 (7th Cir.1982) provided a new defense to the Board's treatment of the record. 710 F.2d at 1265-67. In the instant case, assuming that this case is analogous to Prairie Tank and thus putting aside the arguments of prior notice of treatment of the record raised by the Board, the language of Prairie Tank itself requires the affirmance of the finding of waiver. Affiliated Midwest did not raise the issue at its "first opportunity," the enforcement proceedings, but waited until the motion for reconsideration. An argument should be raised at the appropriate time barring extraordinary circumstances. NLRB v. Cutting, Inc., 701 F.2d 659, 670 (7th Cir.1983). Here, unlike Prairie Tank, the employer had the benefit of the Allis-Chalmers decision, and Prairie Tank, before the Board's decision in the enforcement proceedings. Affiliated Midwest has presented no reasons why it did not raise its arguments in the enforcement proceeding; its arguments on appeal are limited to why the issue was not raised in the certification stage of the action. Thus, assuming arguendo that there was justification for waiting until the enforcement proceeding, there is no basis for excusing the failure to raise the issue until the motion for reconsideration.
 
 IV
 
 36
 For the foregoing reasons the order of the Board will be enforced with the modification that the bargaining order contain the unit descriptions specified in the collective bargaining agreement.
 
 
 
 [1]
 A decertification petition was also filed with respect to the unit composed of registered nurses. That election, unlike the two challenged in this appeal, did result in decertification of the Union. No challenge was made to that result and it thus was not part of the appeal
 
 
 [2]
 The NLRB argues that the Board's application of its policies to the facts is entitled to acceptance in the absence of proof that the Board abused its discretion. The Supreme Court's decision in NLRB v. Action Automotive, Inc., 469 U.S. 490, 105 S.Ct. 984, 83 L.Ed.2d 986 (1985), overrules, according to the NLRB, this particular aspect of the Mosey decision. While the Court in Action Automotive did apply an abuse of discretion standard for bargaining unit determinations, that decision cannot be read to conflict directly with Mosey. First, since Action Automotive dealt primarily with the reasonableness of a Board policy, it assumed that the abuse of discretion standard applied to applications of that policy but did not contain an analysis of appellate deference. Second, this court in Mosey explicitly distinguished the determination of the appropriateness of a bargaining unit and the determination of an election policy from the application of an election policy. The two former were deemed to be classically discretionary decisions as opposed to the latter which is an application of law to facts, a type of decision traditionally reviewed under the substantial evidence standard. 701 F.2d at 615
 
 
 [3]
 While it has been accepted the Midland rule has been subject to criticism and some courts have reserved exceptions for cases where the misrepresentations are so pervasive and deceptive that the Midland assumption that employees can separate the truth from the falsehoods is undermined. See, e.g., Van Dorn Plastic Machinery Co. v. NLRB, 736 F.2d 343, 348 (6th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985); NLRB v. New Columbus Nursing Home, Inc., 720 F.2d 726, 730 (1st Cir.1983). See also NLRB v. Chicago Marine Containers, Inc., 745 F.2d 493, 498 n. 4 (7th Cir.1984) (reserving the possibility that Midland may not apply to all situations). Affiliated Midwest has not argued before this court that the misrepresentations in this case rose to a level that stripped the Midland assumption of its vitality. This court, therefore, need not reach the issue of whether an exception to Midland will be created in this circuit
 
 
 [4]
 The delay of the NLRB in processing this case has created an unusual situation where other courts have approved of the "Riveredge doctrine" before Riveredge itself is reviewed by this court. See NLRB v. Best Products Co., 765 F.2d 903, 911 (9th Cir.1985); NLRB v. Rolligon Corp., 702 F.2d 589, 594-95 (5th Cir.1983). Because this court is the first to review Riveredge with the benefit of a complete record, the earlier cases, while insightful, do not serve as the basis for holding that the Board acted reasonably
 
 
 [5]
 Affiliated Midwest contends that if the Board had not delayed in reaching a decision its case would have been decided before Midland and it would have prevailed. This argument is too speculative to be accepted. It is entirely plausible that the NLRB could have promptly ruled in this case and used it as the vehicle for declaring the new policy rather than Midland. Indeed it may be reasonable to assume that the delay can be attributed to the process of reconsidering the Hollywood Ceramics and Formco policies
 
 
 [6]
 Affiliated Midwest argues that all election irregularities must be analyzed from an objective standard in reliance on Litton Dental Products, 221 NLRB 700, 708 (1975). Indeed, the Board must determine "whether the conduct could reasonably be expected to have an impact on the election." NLRB v. Southern Health Corp., 514 F.2d 1121, 1123 (7th Cir.1975) (citing Hollywood Ceramics, 140 NLRB at 224). This does not, however, make the actual effects irrelevant where they indicate minimal impact nor does this relieve Affiliated Midwest, as an objecting party, of the obligation to present any evidence of the possibility of voter confusion. The objecting party has the burden of establishing that the election was not fair. NLRB v. Mattison Machine Works, 365 U.S. 123, 124, 81 S.Ct. 434, 435, 5 L.Ed.2d 455 (1961). Affiliated Midwest's speculative evidence of voter confusion does not under any standard begin to rise to a level where the fairness of the election would be called into question