# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 03-1576 & 03-1894

WINKIE MFG. CO., INC.,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

_____

Petition for Review and Cross-Application for Enforcement of an
Order of the National Labor Relations Board.
No. 13-CA-40451

_____

ARGUED SEPTEMBER 26, 2003—DECIDED OCTOBER 27, 2003

_____

Before FLAUM, *Chief Judge*, BAUER, and MANION, *Circuit Judges*.

FLAUM, *Chief Judge*. The National Labor Relations Board charged Winkie Manufacturing Company with violating Section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1) and ordered it to engage in collective bargaining with its seasonal employees. Winkie now appeals from the Board's order, claiming that its seasonal employees have no reasonable expectation of reemployment and are therefore ineligible to participate in

a collective bargaining unit with Winkie's full-time employees. For there reasons stated herein, we affirm the Board's order.

## I. Background

Winkie operates a dance-wear manufacturing plant in Chicago. Demand for its costumes fluctuates, reaching a peak from January to late May. Winkie maintains year-round employees, but also hires a seasonal force to meet the high demand of dance season. The seasonal employment pool is drawn from the greater Chicagoland area, including the suburbs. Winkie runs advertisements from the end of December through mid-January or mid-February in the local Spanish-language newspaper, *La Raza*. The parties estimate the labor market to include 385,500 persons.

Winkie's seasonal employees do not receive vacations, holidays, or other benefits enjoyed by the permanent workers. Their opportunities for overtime pay are limited to hours in excess of forty per week, whereas permanent workers may accrue overtime pay by working in excess of eight hours a day and by working on the weekends.

When Winkie hired the seasonal workers for the 2000 and 2001 seasons, plant manager Sandra Schiffler told each applicant that the job was temporary employment and that it would last through May only. She confirmed that no seasonal employee was eligible for insurance, vacations, or holidays. What is more, each seasonal employee hired for the 2001 season signed a statement printed in both English and Spanish agreeing to the temporary, casual, seasonal nature of the job.

Shiffler never promised any temporary or seasonal employee any employment for any future season. Winkie does not have a policy of recalling seasonal employees, nor does

it give them preference in hiring. Winkie does not maintain a list of former seasonal employees, nor does it attempt to contact former employees when hiring for a new season begins. Rather, like any new employee, former seasonal employees are hired if there is job availability at the time the application is made. Moreover, when former seasonal employees are rehired, they are processed as new employees. In the 2001 season, two former employees were denied employment because there was no availability when they applied for work.

In the 2001 season, Winkie hired sixty-three seasonal workers. In this group, seventy-three percent had no previous employment with Winkie and twenty-seven percent had previously worked for Winkie as seasonal employees. Of the sixty-three workers, thirteen did not remain employed throughout the season, and six had worked for Winkie for more than one previous season. In the last two years, Winkie has hired at least 108 seasonal workers. Only six of them have become permanent employees. However, all of Winkie's new permanent employees were drawn from the seasonal pool.

For several years, the AFL-CIO ("Union") has represented the year-round workers. Historically, the Union has not represented seasonal workers. In April 2001, the Union filed a petition seeking to represent a separate unit of Winkie's regular seasonal employees. The Acting Regional Director ("ARD") found that a separate unit was improper because the seasonal workers' interests were too closely intertwined with those of the permanent employees. Thus, the ARD found that it was appropriate to include the seasonal workers in the existing unit of permanent employees.

Winkie filed a request for review, on the basis that the seasonal workers did not have a reasonable expectation of future employment, and thus did not share a community of interests with the permanent workers. The Board denied

the request. The Board conducted a self-determination election. Of the nineteen seasonal employees who voted, twelve cast ballots for representation by the existing unit, and none voted against it.

In August 2002, the Union requested that Winkie bargain with it. After Winkie refused the Union's request, the Union filed an unfair labor practices charge. Based on the Union's charge, the Board's General Counsel issued an unfair labor practice complaint, to which Winkie filed an answer admitting its refusal to bargain with the Union, but disputing the propriety of the Union's certification.

The Board granted the General Counsel's motion for summary judgment, finding that Winkie's refusal to bargain violated Section 8(a) and (1) of 29 U.S.C. § 158(a)(5) and (1). *Winkie Mfg. Co., Inc.*, 338 NLRB No. 106. The Board ordered Winkie to bargain with the Union as the exclusive representative of Winkie's seasonal employees. Winkie now appeals from the Board's decision and the Board seeks enforcement of its order.

## II. Discussion

*Standard of Review*

Appellate review of the Board's representation proceedings is limited. *NLRB v. Tom Wood Datsun, Inc.*, 767 F.2d 350, 352 (7th Cir. 1985). As we have said before, "[w]hile our review is meaningful, it is decidedly deferential: 'The Board's reasonable inferences may not be displaced on review even though [we] might justifiably have reached a different conclusion . . . .'" *Dunbar Armored, Inc. v. NLRB*, 186 F.3d 844, 846-47 (7th Cir. 1999) (citing *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1313-14 (7th Cir. 1991) (en banc)). This court is to review the bargaining unit determination to ensure that it is not arbitrary, unreasonable, capricious, or unsupported by substantial evidence. *Id.* at 847. The

substantial evidence test "requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree that *could* satisfy a reasonable fact finder." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998) (emphasis in original). Given this substantial degree of deference, the limited role of this court is to insist that the Board apply with reasonable consistency whatever standard it adopts to guide the exercise of its delegated power. *Continental Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1089 (7th Cir. 1984).

*Seasonal Worker Eligibility Determination*

The parties do not dispute the standards governing this case. Under Board policy, unit placement and voting eligibility are inseparable issues; if an employee is to be placed in a unit, that employee may vote in the representation election. *See Post Houses, Inc.*, 161 NLRB 1159, 1172 (1966). The Board's test for determining whether seasonal workers are eligible to vote is whether the "seasonal employees . . . share sufficient interests in employment conditions with the other employees to warrant their inclusion in the unit." *Kelly Bros. Nurseries, Inc.*, 140 NLRB 82, 85-86 (1962). This determination depends upon those employees' expectation of future reemployment: regular seasonal employees with a reasonable expectation of reemployment in the foreseeable future are sufficiently interested in the working conditions of the unit and are eligible to vote on placement in a unit with permanent employees, whereas casual employees with no such expectation are not. *Kelly Bros.*, 140 NLRB at 85-86. While the determination of whether a group of employees has a reasonable expetation of future reemployment is a fact-intensive determination for which there is no "hard and fast rule," *see NLRB v. Bar-Brook Mfg. Co.*, 220 F.2d 832, 834 (5th Cir. 1955), the Board regularly assesses the following factors: the size of the area

labor force, the stability of the employer's labor require-
ments and the extent to which it is dependent upon sea-
sonal labor, the actual reemployment season-to-season of
the worker complement, and the employer's recall or pre-
ference policy regarding seasonal employees. *Maine Apple
Growers, Inc.*, 254 NLRB 501, 502 (1981). *See also Sitka
Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1179 (D.C.
Cir. 2000) (citing the *Maine Apple Growers* factors); Office
of the Gen. Counsel, Nat'l Labor Relations Bd., *An Outline
of Law and Procedure in Representation Cases*, 199 (1999)
(listing factors militating in favor of finding employees
regular seasonal employees inclusion as: same labor force;
preferences in rehiring former employees; similarity of
duties and benefits; stabilized demand for and dependence
on seasonal employees).

   Winkie focuses its analysis on the following cases where
the Board found that seasonal employees should not be
included in the bargaining unit because they did not have
a reasonable expectation of reemployment: *Macy's East*, 327
NLRB 73 (1998); *Freeman Loader Corp.*, 127 NLRB 514
(1960); *F.W. Woolworth Co.*, 119 NLRB 480 (1957); *Indi-
vidual Drinking Cup Inc.*, 115 NLRB 947 (1956); *Great
Atlantic and Pacific Tea Co.*, 116 NLRB 1463 (1956); and
*Montgomery Ward & Co.*, 110 NLRB 256 (1954). Factor for
factor, we agree with Winkie that the Board's decision in
this case does not precisely comport with many conclusions
drawn in those cases. For example, in *Freeman*, there was
a twenty percent turnover rate within the seasonal em-
ployees. Winkie also has a twenty percent turnover. More-
over, as with Winkie's seasonal employees, the seasonal
employees in *Freeman* did not enjoy benefits conferred on
the permanent employees. Most notably, in *Freeman* twen-
ty-nine percent of seasonal workers had previously worked
for Freeman while Winkie has just twenty-seven percent re-
turning seasonal employees. Indeed, it appears that the

Board has set a lower bar by finding a reasonable expectation for reemployment where Winkie's seasonal employees have a twenty-seven percent return rate.

Furthermore, in *Woolworth* the employer had a policy of recalling its seasonal employees and in *Individual Drinking Cup* the company maintained a list of former seasonal workers. In contrast, Winkie has no formal recall policy, nor does it notify former employees of openings or give them preferences in the hiring process. Additionally, of Winkie's 108 employees of the last two seasons, only six, or five percent, became permanent employees. In *Individual Drinking Cup* the Board found no reasonable expectation of reemployment despite evidence that twenty-five percent of seasonal employees became permanent employees.

In response, the Board argues that other considerations outweighed these factors. Indeed, a number of elements in the cases Winkie cites cut against Winkie. Specifically, Winkie depends on approximately sixty employees every January through May—compared to thirty-five seasonal workers in *Freeman* and just eight in *Macy's*. The Board maintains that this regular need for a large labor force enables current seasonal employees to anticipate future openings. The Board also argues that Winkie's employees are drawn from a static and definable pool: the Chicago Hispanic community. Because Winkie advertises in *La Raza*, the Board maintains that the labor pool remains small, specifically Spanish-speaking individuals who read *La Raza* and know how to operate a sewing machine.

Furthermore, the Board disputes Winkie's method for understanding the "transition to permanent employment" factor. Rather than focusing on how few employees become permanent employees, the Board claims that the test focuses on the source of the new employees—all of Winkie's new permanent employees came from the seasonal pool.

We are not unsympathetic to Winkie's position that the Board's decision in this case conflicts with aspects of its past cases. Understandably, companies like Winkie often look to the Board's decisions for guidance in how to handle their employment policies. Ultimately, however, we accept the Board's position that the multi-factor test is flexible. Rather than setting numeric minimums for each factor, the Board may evaluate whether the totality of a company's actual hiring practices foster a reasonable expectation of re-employment among seasonal workers. *See Maine Apple Growers*, 254 NLRB at 503 (1981) (explaining that an employer need not demonstrate a positive finding for each factor in order to sustain a finding of reasonable expectation of future employment).

In this case, the Board's finding is supported by substantial evidence. The Board focused its analysis on the factors that it typically employs. Although we may have reached a different conclusion had we been the trier of fact, we cannot say that the Board's finding was arbitrary, unreasonable, capricious, or unsupported by substantial evidence. *See Dunbar*, 186 F.3d at 847. As we have stated before, the Board uses a common law method and is permitted to draw new distinctions. *See Continental Web Press*, 742 F.2d at 1093. While the Board may have deviated somewhat from its precedent here, we cannot conclude that it abandoned its stated policy of employing the factors set out in its previous decisions and listed in the *Outline of Law and Procedure in Representation Cases*.

## Conclusion

The Board's order is AFFIRMED.

A true Copy:

Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*